OPINION
{¶ 1} Appellant, Christine M. Weller, appeals from the October 12, 2004 judgment entry of the Geauga County Court of Common Pleas.
 {¶ 2} On August 17, 1999, appellant filed a complaint for divorce against appellee, Daniel L. Weller. On September 9, 1999, appellee filed his answer and counterclaim for divorce against appellant. On September 26, 2000, Magistrate Thomas J. Mullen ("Magistrate Mullen") ordered the parties to submit briefs on the issue of whether health care benefits and accumulated sick pay were marital assets. On October 11, 2000, appellant filed her trial brief arguing that these items were marital assets. On October 16, 2000, appellee filed his trial brief taking the opposite position. On October 24, 2000, the trial court filed its order finding that appellant's position was not well-taken, and stating that the court would not hear evidence on health insurance and sick pay. The divorce hearing was held November 6 and 7, 2000, ("Divorce Hearing") before Magistrate Mullen. The magistrate issued his decision on February 20, 2001. The trial court filed its judgment entry on June 14, 2001, ("Divorce Decree") adopting the magistrate's decision.
 {¶ 3} On July 13, 2001, appellant filed a timely notice of appeal (hereafter this appeal is referred to as "Weller 1"), and on October 12, 2001, she filed her appellate brief, alleging,inter alia, that the trial court erred (1) in ordering the preclusion of evidence regarding appellee's health care benefits and accumulated sick pay, and (2) in not awarding her one-half of the value of appellee's health care benefits and accumulated sick pay.
 {¶ 4} On December 26, 2002, this court filed its opinion inWeller 1 (Weller v. Weller, 11th Dist. No. 2001-G-2370, 2002-Ohio-7125). We held that "the trial court erred in determining as a matter of law that appellee's health insurance and accumulated sick leave benefits were not marital property and therefore, were not subject to division. As a result, a hearing must be held to determine what portion, if any, of appellee's health insurance and accumulated sick pay benefits are marital property." Id. at ¶ 26. This court further held that the second assignment was premature until this determination was made. On August 1, 2003, and September 23, 2003, a remand hearing was held before Magistrate Mullen to address these issues ("Remand Hearing").
 {¶ 5} The facts pertinent to this appeal are as follows: appellant and appellee were married on August 21, 1965. In 1971, when appellee commenced working as a teacher with the Bedford City Schools ("Bedford"), he became a participant in the State Teachers Retirement System ("STRS"), an Ohio pension system which provides as one of its benefits a comprehensive health care plan. As part of the total compensation package given to appellee, Bedford paid directly to the STRS a percentage of appellee's gross pay, part of which went to the pension fund and part of which went to the STRS health insurance fund. At the time of the Divorce Hearing, appellee had 29.25 credited years of service, and Bedford was paying a total of 14 percent of appellee's gross salary to the STRS, with 9.3 percent directed to the pension plan, and 4.7 percent going into the health insurance fund.[1] At that time, appellee had also accumulated 137.25 sick days, earned at a rate of 1.25 days per month.
 {¶ 6} At the Remand Hearing, pension evaluator, David I. Kelley ("Kelley"), who the parties stipulated was an expert regarding pension evaluations, appeared as a witness for appellant and presented expert testimony as to the details and value of appellee's retirement health care benefits. Appellant also called Sherman C. Micsak ("Micsak"), Assistant Superintendent for Bedford, who testified regarding appellee's accumulated sick leave, and how it is converted into severance pay at retirement.
 {¶ 7} In the magistrate's decision dated January 26, 2004, ("Magistrate's Remand Decision") Magistrate Mullen found that "[a]ny post-retirement subsidized health insurance * * * which the defendant may or may not receive upon his retirement has no marital value in this case" as the valuation is "much too speculative." Likewise, the magistrate found that "[t]he value of [appellee's] unused accumulated sick time is too speculative" because appellee might use his accumulated sick time before he reaches retirement age.
 {¶ 8} Pursuant to its October 12, 2004 judgment entry, the trial court adopted the magistrate's decision that appellant failed to meet her burden of establishing the value of the retirement health insurance subsidy and the unused sick pay, because the valuations were too speculative. The trial court adopted the magistrate's conclusion that the health care subsidy had "no marital value." Additionally, the trial court adopted the magistrate's conclusion that the sick leave was too speculative to value. It is from that judgment that appellant filed a timely notice of appeal and raises the following assignments of error:
 {¶ 9} "[1.] The trial court erred to the prejudice of [a]ppellant, when it failed to follow the law of the case as enunciated by the [c]ourt of [a]ppeals in Weller 1 in which the [a]ppellate [c]ourt held that the health insurance benefits and accumulated sick pay earned during the marriage belonged to the marital estate and were subject to equitable division upon divorce.
 {¶ 10} "[2.] The trial court erred to the prejudice of [a]ppellant, when it failed to use the date of divorce, November 6, 2000, as the date of valuation regarding health insurance benefits and accumulated sick pay earned during the marriage as belonging to the marital estate and being subject to equitable division upon divorce."
 {¶ 11} The assignments of error will be consolidated for review since the raised issues are interwoven in the analysis of the proper determination and valuation of these benefits.
 {¶ 12} In her first assignment of error, appellant argues that the trial court did not follow the law of the case as set forth by this court in Weller 1. In her second assignment of error, appellant argues that the trial court used an unspecified future date in valuing the benefits instead of the date of divorce.
 {¶ 13} "`In reviewing the equity of a division of property (including retirement benefits * * *), one of the basic guidelines an appellate court is bound to follow is that the trial court's judgment cannot be disturbed on appeal absent a showing that the (trial court) abused its discretion (* * *).'"Cain v. Hamrick-Cain, 11th Dist. No. 2002-A-0086,2004-Ohio-2448, ¶ 10, quoting Martin v. Martin (1985),18 Ohio St.3d 292, 294-295. An abuse of discretion is "more than an error of law or judgment; it implies that the trial court's attitude is unreasonable, arbitrary or unconscionable." Blakemore v.Blakemore (1983), 5 Ohio St.3d 217, 219.
 {¶ 14} The "law of the case" doctrine was described by the Supreme Court of Ohio in Nolan v. Nolan (1984),11 Ohio St.3d 1, 3-4:
 {¶ 15} "[T]he doctrine provides that the decision of a reviewing court in a case remains the law of that case on the legal questions involved for all subsequent proceedings in the case at both the trial and reviewing levels. * * * Thus, where at a rehearing following remand a trial court is confronted with substantially the same facts and issues as were involved in the prior appeal, the court is bound to adhere to the appellate court's determination of the applicable law. * * * Moreover, the trial court is without authority to extend or vary the mandate given." (Citations omitted.)
 {¶ 16} Thus, absent extraordinary circumstances, legal determinations made by this court must be followed by inferior courts in subsequent proceedings of that particular case.Lapping v. HM Health Services., 11th Dist. No. 2004-T-0011,2005-Ohio-699, at ¶ 18.
 {¶ 17} In Weller 1 at ¶ 24, we stated with regard to sick leave benefits:
 {¶ 18} "[S]everal Ohio appellate districts have determined that accrued sick leave benefits resemble deferred bonus payments or pension plan accumulations and, as such, qualify as an interest in property subject to division as a marital asset under R.C. 3105.171(A)(3)(a)(ii). Herrmann v. Herrmann (Nov. 6, 2000), 12th Dist. Nos. CA99-01-006 and CA99-01-011, 2000 Ohio App. LEXIS 5146, at 9; Hartley v. Hartley (Apr. 24, 1998), 2nd Dist. No. 16668, 1998 Ohio App. LEXIS 1745, at 3-4; Pearson v.Pearson (May 20, 1997), 10th Dist. No. 96 APF08-1100, 1997 Ohio App. LEXIS 2223, at 8-9. The rationale for this principle is that `since sick leave benefits, like deferred bonus payments or pension plan accumulations, are accumulated by the employee during the employment in exchange for past services rendered, they are essentially deferred compensation earned during working years.' Herrmann * * * at 10. Hence, if the sick leave benefit is earned by the employee spouse during the marriage, then it logically belongs to the marital estate."
 {¶ 19} With regard to retirement health care benefits, we stated:
 {¶ 20} "Likewise, a health insurance benefit paid for with marital funds and subsequently received upon the employee spouse's retirement may be deemed marital property subject to division upon divorce. In support of this proposition, we rely onBabka v. Babka (1992), 83 Ohio App.3d 428, 433-434 * * *, which held that portions of life insurance policies paid for with marital funds were marital property. Furthermore, `other retirement benefits acquired by either spouse during the course of a marriage are marital property subject to equitable division upon divorce.' Frederick v. Frederick (Mar. 31, 2000), 11th Dist. No. 98-P-0071, 2000 Ohio App. LEXIS 1458 * * *, at 17. See, also, Hoyt v. Hoyt (1990), 53 Ohio St.3d 177, 178 * * *; R.C.3105.171(A)(3)(a)(i) and (ii). Since appellant contends that appellee contributed his employment wages to maintain health insurance benefits upon retirement, this may be deemed part of the marital estate." Weller 1 at ¶ 25. (Parallel citations omitted.)
 {¶ 21} Based on these conclusions, we held that "the trial court erred in determining as a matter of law that appellee's health insurance and accumulated sick leave benefits were not marital property[,]" and we remanded the case to the trial court for a hearing to determine "what portion, if any, of appellee's health insurance and accumulated sick leave benefits are marital property." Id. at ¶ 26. (Sic.)
 {¶ 22} Thus, the trial court was required to accept our determination that retirement health care benefits and accrued sick leave benefits are interests subject to division as marital assets, and was charged with making a determination as to what portion of these benefits were marital assets. This would require determinations about whether any portion of these benefits were acquired during the marriage, whether the health care benefits were paid with marital funds, and whether the accumulated sick leave was earned in exchange for past services rendered. If these determinations were found to be in the affirmative, then the trial court was required to determine the value of these assets so they could be equitably divided.
 {¶ 23} Neither the Magistrate's Remand Decision nor the trial court's October 12, 2004 judgment entry adopting that decision state whether the benefits were acquired during marriage. However, the Divorce Decree states that the duration of the marriage is from August 21, 1965, to November 6, 2000.[2] A review of the record reveals that appellee became a participant in the STRS in 1971, six years after his marriage commenced, and he was still a participant at the time of the Divorce Hearing on November 6, 2000. By that time, he had accumulated 29.25 years of credited service and was fifty-seven years old. Testimony revealed that a participant with twenty-five years of credited service was eligible to retire at age fifty-five. Thus, appellee was fully eligible to retire and receive the STRS health care benefits at the end of his marriage. Moreover, the health care benefits were paid in part with marital funds. The record shows that the employer contribution to the STRS was part of appellee's "total compensation." Since appellee needed thirty years of credited service to receive the maximum benefits in the plan, one-thirtieth of the health care benefits would not qualify as marital property, with the remainder qualifying as marital property to be valued for division and distribution.[3]
 {¶ 24} The record also shows that the accumulation of appellee's 137.25 sick days, which amount was stipulated to by the parties, occurred during the marriage time frame, and the sick days were earned for past service, at a rate of 1.25 days per month. Thus, the 137.25 sick days qualified as marital property to be valued for division and distribution.
 {¶ 25} Pursuant to our remand, the trial court should have conducted this analysis to determine what portion of the benefits was marital. Thus, after reviewing the record, we agree that the trial court committed reversible error in not finding any marital value in the health care subsidy and as such, violated the law of the case. Likewise, we agree that the trial court erred in not carrying out our mandate to determine what portion of the sick leave accrual was marital and as such, also violated the law of the case. Thus, appellant's first assignment of error has merit.
 {¶ 26} We also agree with appellant that the trial court did not set a date certain for valuing the benefits. In Coble v.Gilanyi (Dec. 23, 1999), 11th Dist. No. 97-T-0196, 1999 Ohio App. LEXIS 6267, at 8-9, we held:
 {¶ 27} "As a general matter, a trial court should consistently apply the same set of dates when valuing marital property that is subject to division and distribution in a divorce proceeding. However, this court has previously held that `the circumstances of some cases may require the use of different dates for valuation purposes(.)' Miller v. Miller (May 24, 1996), [11th Dist.] No. 95-G-1942, * * * 1996 Ohio App. LEXIS 2188, at 4. We have further held that the trial court must adequately explain its reasons for choosing a different valuation date for certain marital assets. Cottage v. Cottage (June 13, 1997), [11th Dist.] No. 96-T-5412, * * * 1997 Ohio App. LEXIS 2592, at 19. These holdings are consistent with the R.C.3105.171(G) requirement that the trial court `shall make written findings of fact that support the determination that the marital property has been equitably divided and shall specify the dates it used in determining the meaning of "during the marriage."'"
 {¶ 28} Trial courts have typically employed dates such as the date of the divorce decree, the divorce hearing, the parties' separation date, or the date of the pretrial conference. See Dayv. Day (1988), 40 Ohio App.3d 155, 158; Rupp v. Rupp (Nov. 27, 1987), 6th Dist. No. OT-86-71, 1987 Ohio App. LEXIS 9760, at 4;Herrmann, supra, at 26.
 {¶ 29} Because appellee had not yet retired at the time of the Remand Hearing, the trial court found it impossible to know with certainty the true value of the benefits. Using appellee's unknown retirement date rather than a date certain, it then determined that the value of the sick leave benefit was too speculative because appellee might use all of his sick days by the time he retires. Likewise, in valuing appellee's health care benefits, the court noted, based on testimony, that the benefits were not statutorily mandated, and that the health care benefits may or may not still be available when appellee retires.
 {¶ 30} In the Divorce Decree, the trial court used the November 6, 2000 hearing date in determining and valuing the marital portion of appellee's pension benefit. It also used this date as the effective date for spousal support. Also, as stated earlier, it used this date as the end point for the marriage's duration. Therefore, this date, or another date justified by the circumstances of the case, should have been employed by the trial court to value the sick leave and health care benefits.
 {¶ 31} Appellant's two witnesses provided valuation evidence at the Remand Hearing. Micsak, who testified on behalf of Bedford regarding the value of appellee's sick leave benefits, provided benefit and salary records as of November 6, 2000. Kelley, who testified regarding the value of the health care benefits, provided calculations and a written report using March 7, 2000 as the valuation date.[4]
 {¶ 32} Micsak's testimony revealed that upon a staff member's resignation after twenty-five or more consecutive years of service with Bedford, or age fifty-two with twenty consecutive years of service, Bedford must grant a severance payment to the staff member. Severance pay is determined by multiplying the per diem rate of contracted pay, upon retirement, by the unused sick leave days up to but not exceeding thirty days, plus one additional day for every ten days in excess of thirty days. According to a master agreement between the Bedford Education Association and the Bedford City School District Board of Education ("Master Agreement"), the per diem rate is the salary from the staff member's salary schedule, excluding supplemental salaries and longevity pay, divided by one hundred eighty-six actual working days. Appellee's base salary, excluding his supplemental salary and longevity pay, was $58,319 for the 1999-2000 school year. Using the valuation date of November 6, 2000, his per diem rate was $313.54, and he had accumulated 137.25 days of unused sick leave. Therefore, the value of his severance pay as of that time was $313.54 times thirty unused sick days, plus $313.54 times one-tenth of the remaining 107.25 days. Using these calculations, the value of his sick leave accrual was $12,770.48.
 {¶ 33} Micsak also admitted on cross-examination that if appellee got sick, remained sick and was not able to work for 137.25 days, he would use up his sick time. Based on this representation, Magistrate Mullen found that "[p]laintiff has * * * failed to meet her burden of establishing a value of unused sick time. If defendant lives to retirement age but uses his accumulated sick time, he may receive zero days of sick pay * * *." The trial court adopted this finding in its October 12, 2004 judgment entry.
 {¶ 34} We agree that the trial court abused its discretion in failing to place a value on appellee's sick leave benefits. Despite the uncertainties noted by the trial court, it still had a duty to value the martial assets. In Wenger v. Wenger, 9th Dist. No. 02CA0065, 2003-Ohio-5790, at ¶ 18, the expert testified that the defendant's sick leave pay "equated to `essentially one years pay(.)'" The trial court concluded that this did not establish a value, and therefore excluded this benefit from the marital property division. Id. The appellate court reversed the trial court, stating that it had a duty to value the benefit, and "[i]f the parties fail to present evidence regarding an asset's value, the trial court should instruct the parties to submit such evidence." Id. See, also, Rupp, supra (appellate court reversed trial court for failing to value unused sick leave benefits, and held that trial court has responsibility for causing the determination of the value of assets notwithstanding lack of evidence as to value); Willis v. Willis (1984),19 Ohio App.3d 45 (held that trial court has broad discretion to develop some measure of value but is not privileged to omit valuation altogether); Presby v. Presby, 7th Dist. No. 03 MA 198,2004-Ohio-3050 (even where sick leave cannot be liquidated upon retirement, spouse is entitled to share in the value in some way, such as by adding the days to years of service in computing pension benefits).[5]
 {¶ 35} In this case, there was ample evidence presented to place a value on the sick leave benefits. Using the valuation date of November 6, 2000 rather than some uncertain date in the future, the trial court could have placed a present value on appellee's vested contractual right at that time to receive the future payment of unused sick days. The trial court's finding — that because appellee might use up his sick days prior to retirement the benefit is too speculative to value — is without merit. In Herrmann, supra, at 12, the appellate court noted that placing a cash value on the sick leave benefit as of the date the marriage is terminated would actually "alleviate concerns by either party that the [benefit holder] may or may not use her sick leave in the future." Moreover, there are usually limits on how sick leave may be used. In Pearson, supra, at 23, the appellate court examined not only the contractual right to receive the value of the benefit upon retirement, but also the employer's policy regarding the conditions under which the sick days were subject to depletion. As in Pearson, appellee's right to use his sick days is limited by Section 8.13 of the Master Agreement, which provides that he may only use the sick days for "personal illness, * * * injury, exposure to contagious diseases * * * and for absences due to illness, injury, or death in the * * * staff member's immediate family."
 {¶ 36} In order to assure that justice is served in the event that earned sick days are used before retirement, some courts value this benefit but retain jurisdiction to adjust the amount of the benefit upon distribution. See Pearson at 8.
 {¶ 37} The valuation of the health care benefits is more complex. Kelley, who testified as appellant's expert witness, stated that he had performed state health care plan valuations for about ten years in addition to writing numerous articles and book chapters on retirement health care benefits as marital assets. He testified that retirement health care benefit valuations are similar to pension valuations, which involve reducing a future monthly payment for the health care benefit over a person's projected life expectancy, discounting the possible payments by a mortality factor and an interest factor, and then summing the monthly payments. He stated that at that time, the STRS was extending health care coverage to plan participants retiring with fifteen years or more of credited service. He explained that the STRS is mandated to withhold a portion of an employee's compensation package to fund this benefit, if the employee participates in the pension plan.
 {¶ 38} According to Kelley and his written health care valuation report dated March 7, 2000, the STRS health care plan consists of three components. Under the first component, the plan offers health care coverage to retirees who are not yet sixty-five years of age at a cost highly subsidized by the STRS ("Pre-65 Benefit"). When the participant reaches age sixty-five, the Pre-65 Benefit ends. The participant then becomes covered under Medicare, and the next two components of the health care plan kick in. The second component is a supplemental insurance — a smaller benefit to cover gaps in Medicare's coverage ("Medigap Benefit"). The third component is insurance that reimburses a Medicare Part B payment ("Medicare Part B Benefit").[6]
 {¶ 39} The annual premiums for the three types of benefits as of March 7, 2000 were $5,076, $2,280, and $546, respectively. The amount that the STRS subsidized for a participant was graduated based on years of credited service. The formulas for determining a participant's annual subsidy for the three components, as of March 7, 2000, were as follows:
 {¶ 40} Pre-65 Benefit: $1,644 + $90 times years of credited service, up to thirty years maximum service.
 {¶ 41} Medigap Benefit: $1,104 + $31.50 times years of credited service, up to thirty years maximum service.
 {¶ 42} Medicare Part B Benefit: $16.38 times years of credited service, up to thirty years maximum service.
 {¶ 43} The amount that a participant had to pay was the difference between the annual premium and the subsidized cost.
 {¶ 44} In determining a present value for appellee's health care benefits, Kelley used the rounded number of twenty-nine years of credited service, and then calculated the annual STRS subsidies for the three components, assuming that appellee was to retire immediately. He determined that appellee was entitled to an annual subsidy of $4,254 for the Pre-65 Benefit, $2,017 for the Medigap Benefit, and $475 for the Medicare Part B Benefit. Since appellee was 56.68 years old at the time of the March 7, 2000 calculation, Kelley determined that he would receive the Pre-65 Benefit subsidy for 8.3 years before Medicare kicked in. He would receive the Medigap Benefit and the Medicare Part B Benefit until his death, which, using a mortality factor, was estimated to occur at age eighty. In summing the totals after discounting for the mortality factor and an interest factor, Kelley determined that the present value of appellee's health care benefits was $47,661.13.
 {¶ 45} Although appellee was entitled to immediately receive the benefits at these highly-subsidized rates due to his years of credited service, Kelley also admitted that the health care plan is not a statutorily guaranteed benefit, unlike the pension benefit which is mandated by law. On cross-examination, Kelley admitted that if the STRS board discontinued the health care benefits, his calculations of the value of this benefit would prove to be in error at that time.
 {¶ 46} Based on these latter representations, Magistrate Mullen and the trial court determined that the health care benefit was "speculative" and therefore of no value.
 {¶ 47} This court disagrees with the trial court's ruling that the lack of a statutory guarantee for provision of the STRS health care benefit makes the benefit so "speculative" as to render it valueless. Many present valuations of benefits are uncertain. As Kelley testified, just as with pension valuations, if a participant dies sooner than the age determined by the mortality factor, the present value would decrease, and conversely, if a participant lives longer, the present value increases. Likewise, if interest rates go up, present value goes down. Conversely, as interest rates decrease, present value increases.
 {¶ 48} Moreover, there was no evidence presented that the STRS health care benefit was, in fact, in danger of being discontinued. R.C. 3307.39 grants authority to the STRS to provide health coverage to benefit participants, spouses and dependents. The coverage cost paid from STRS funds must be included in the employer's STRS contribution, which is currently fourteen percent of covered payroll. Id.; R.C. 3307.28. These contributions go into the Health Care Stabilization Fund ("HCSF") from which health care benefits are paid.
 {¶ 49} According to the STRS's March 2005 report titled "A Report to the Ohio Retirement Study Council" ("Report"),[7]
the STRS "currently has on hand 76 % of the assets needed to pay all benefits accrued to date — even though the liabilities will not actually be payable for many years." Id. at 1. The Report lists several steps the STRS Retirement Board ("Retirement Board") has taken to ensure the security of pension benefits and preserve health care coverage for retirees, which includes increases to required member contributions that began in 2003, changes to eligibility qualifications for health care coverage that began in 2004, and a fifty percent reduction in the match from the Employer Trust Fund, which represents an additional $12 million to $14 million annually that will be paid toward unfunded liability. The Report stated that "[t]hese actions, along with the recent upturn in the markets, have helped the funding situation[,]" and "[o]ur reports confirmed that all of theretirement systems remain financially secure to pay all mandatedpension benefits when they become due well into the future." Id.
 {¶ 50} In addition, although Ohio law does not guarantee payment of the Pre-65 Benefit or the Medigap Benefit, it does guarantee partial reimbursement of Medicare Part B premiums. See R.C. 3307.39(B). The Report notes that the STRS has provided subsidized health care coverage for more than thirty years. Report at 6. Further, Ohio law directs the Retirement Board to invest the collected contributions prudently under a plan that "will cover the cost of the pension and other benefits earned by the participants * * *." Report at 4. See, also, R.C. 3307.15. The Report does note, however, that the Retirement Board has decreased the portion of the employer contribution going into the Health care stabilization Fund from 4.5 percent to one percent since July 1, 2003, and that to maintain the fund solvency, participants "will have to pay an increasingly larger amount toward their health care costs." Report at 5.
 {¶ 51} Because there was sufficient evidence of the value of appellee's retirement health care benefits, and no evidence that these benefits would be discontinued in the future, the trial court abused its discretion in finding that appellant failed to meet her burden of establishing the value of the health care benefit. Although the trial court could have used the November 6, 2000 date to value appellee's health care benefits, based on the circumstances of the case, that the divorce hearing was originally scheduled for March 10, 2000, and that Kelley's report was dated a few days prior to that time — it would have been appropriate for the trial court to use Kelley's March 7, 2000 valuation date.
 {¶ 52} As with the sick leave benefits, the trial court could have resolved any speculation by retaining jurisdiction in the event that heath care benefits were discontinued at the time appellee retired, or reduced to such a degree that the court's valuation turned out to be substantially overstated.
 {¶ 53} This court recognizes the difficulties trial courts face when valuing and dividing retirement benefits. However, when parties divorce, they are entitled to an equitable portion of the marital estate. Included in the marital estate are retirement benefits including sick leave accrual and health care subsidies paid upon retirement. Simply because a marital asset may be difficult to value, does not mean that a party is not entitled to an equitable share of that asset. It would be reversible error for a trial court to simply hold that a party is not entitled to a portion of the pension or 401(K), simply because it was "too speculative to value."
 {¶ 54} "`[T]he trial court should attempt to ascertain the optimum value the pension or retirement benefits has to the parties as a couple.'" DiFrangia v. DiFrangia, 11th Dist. No. 2003-T-0004, 2003-Ohio-6090, at ¶ 22, quoting Hoyt, supra, at 183. The rationale behind this lofty goal is obvious, but was stated aptly by the Second District Court of Appeals in Layne v.Layne (1992), 83 Ohio App.3d 559, 567. We quoted this rationale in its entirety in DiFrangia at ¶ 23, but it bears repeating here: "`[a] retirement plan is an investment made by both spouses during marriage to provide for their later years. They anticipate that the value of the investment will increase with time. At divorce, each spouse is entitled to the value of his or her investment. When the investment has not yet matured, each is entitled to a right to its value at maturity in proportion to the years of marriage. The nonemployed former spouse is not entitled to share in the direct contributions made by the participant former spouse after divorce. However, the nonemployed former spouse is entitled to the benefit of any increase in the value of his or her unmatured proportionate share after divorce attributable to the continued participation of the other spouse in the retirement plan. That increase was contemplated when the investment was made. It would be inequitable to deprive the owner of its value. So long as each former spouse is limited to his or her proportionate right to share, there is neither unjust enrichment of the nonparticipant nor an inequitable deprivation of his or her rights.'"
 {¶ 55} Layne and DiFrangia were obviously referring to a pension or 401(K). However, the same rationale is analogous to other retirement benefits, including health care benefits and sick leave accrual. They are benefits earned during working years which, had the parties remained married, would have benefited both spouses upon retirement. Married couples contemplate the fact that they will be covered under the employed spouse's health care insurance upon retirement, just as they contemplate the fact that it will be the employed spouse's pension or 401(K) which they will receive when the employed spouse retires. Similarly, married couples consider the fact that, if either spouse has not used his or her accumulated sick time, the parties will receive the value of the benefit upon retirement. It would be unjust and inequitable to deprive appellant of her proportionate share of these retirement benefits.
 {¶ 56} In Hoyt, supra, the Supreme Court of Ohio laid the foundation which lower courts should follow when dividing retirement benefits. The Supreme Court noted, at 180, that "[w]hen considering pension or retirement benefits, a trial court must be given discretion. * * * `[F]lat rules have no place in determining a property division.' * * * The trial court must have the flexibility to make an equitable decision based upon the circumstances of the case, the status of the parties, the nature, terms and conditions of the pension plan, and the reasonableness of the result." (Citations omitted.)
 {¶ 57} In DiFrangia, supra, this court noted the difficulties in equitably dividing retirement benefits. We stated: "[i]n Hoyt, the Supreme Court recognized that, in dividing a pension or retirement benefit, a trial court `should attempt to preserve the pension or retirement benefit asset in order that each party can procure the most benefit,' and that a court `should attempt to disentangle the parties' economic partnership so as to create a conclusion and finality to their marriage.'" Id. at ¶ 9, quoting Hoyt, supra, at paragraph two of the syllabus. We noted, however, that "[i]t is not always possible * * * to serve both goals." Id.
 {¶ 58} A lower court has several alternatives to consider when determining how to equitably divide the retirement benefits based upon the circumstances of each case. Hoyt at 181. One alternative is to directly divide the benefit. Id. Other alternatives include "immediate offset or a current assignment of proportionate shares, with either a current distribution or a deferred distribution. A deferred distribution may consist of either a current assignment or a division of the asset at such time that the plan directs distribution based upon the employee's eligibility." Id. Deferring distribution divides the risk between the parties that the benefits will fail to vest or mature. Id. at 182. However, the nonemployee spouse bears the risk that the other spouse will quit or pass away before the expected benefits become vested and mature. Id.
 {¶ 59} In Frederick, supra, at 58-59, this court summarized the four primary methods in equitably dividing retirement assets as: "(1) ordering the withdrawal of the employee's entire share from the fund; (2) offsetting the present value of the nonemployee spouse's equitable share with other marital property; (3) offsetting the present value of the nonemployee spouse's equitable share with installment payments made by the employee spouse; and (4) using a QDRO to order that a percentage of the employee spouse's future benefits be assigned to the nonemployee spouse, if and when the pension reaches maturity."
 {¶ 60} If the retirement benefits are vested and matured, the value is fixed and easily ascertainable. Hoyt, supra, at 182. However, "where the pension benefits [are] vested but unmatured at the time of divorce, it may not be possible or equitable to effect a final division of retirement benefits. Where the pension is unmatured, the ultimate value of the asset is dependent upon future contingencies such as the participant's age and pension service credits at the time of retirement. * * * `When the amount to be paid can only be determined at the later point of maturity at retirement, a current order should divide and distribute only the right to receive a share of the unmatured [retirement] benefit, reserving determination of the exact amounts to the later time when they are known.'" DiFrangia at ¶ 9, quotingHoyt at 182. While the general rule in Ohio is that a trial court does not retain jurisdiction to alter a division of marital property, it has the power to clarify and construe its original property division so as to effectuate its judgment. DiFrangia
at ¶ 10.
 {¶ 61} In Weller 1, we upheld the trial court using the coverture formula set forth in Hoyt regarding the division of appellee's STRS pension fund. In Weller 1, the trial court found that appellee's STRS pension had a present value of $498,562.03 and that the entire amount represented the marital portion since the parties were married when appellee became a member of STRS. However, the trial court did not order appellee to immediately pay appellant fifty percent of $498,562.03. Instead, in Weller 1, at ¶ 73, we quoted the trial court as saying:
 {¶ 62} "`Mr. Weller (appellee) shall pay Mrs. Weller (appellant), 50 [percent] of the marital portion of his pension commencing upon the date of his retirement and with the first payment of his pension. (Appellant's) 50 percent of the marital portion shall be calculated by multiplying the monthly pension by a fraction. The numerator of the fraction shall be the number of months of (appellee's) participation under the plan while married to (appellant) (* * *) and the denominator shall be the total number months of his participation under the plan as of the date of his retirement.'"
 {¶ 63} In Weller 1, the parties' divorce was filed in 1999. Thus, we noted that public retirement pension programs, including STRS, could not be subject to a QDRO.[8] Since appellee's STRS pension could not be divided pursuant to a QDRO, we upheld the trial court's determination that appellant's portion of appellee's STRS pension should be determined by utilizing a coverture fraction, representing the years of marriage during the pension and the total number of years appellee participated in the pension. We held that "the trial court's calculation of appellee's STRS pension plan, to which appellant is entitled, is in accordance with the coverture fraction formula established by the Supreme Court in Hoyt." Id. at ¶ 74.
 {¶ 64} In the instant appeal, there is no reason the trial court could not have presently valued the health insurance retirement subsidy and sick leave accrual and then, following the same reasoning and coverture fraction formula, divided the benefits accordingly, just as it did when it placed a present value on the pension and equitably divided it pursuant to the same formula. Moreover, as we stated in the foregoing analysis, the court may retain jurisdiction to modify the value upon distribution. If the court did so, it would alleviate appellee's concerns that he may use his sick time if he becomes ill or unable to work, or if his health insurance subsidies are reduced to such a degree that the court's valuation turned out, in hindsight, to be substantially overstated.
 {¶ 65} In today's uncertain economy, retirement benefits, including pensions, whether vested or not, as well as health insurance subsidies and sick leave pay, are never guaranteed.[9] Nevertheless, these benefits, if determined to be marital property, are subject to division when parties divorce. R.C. 3105.171.
 {¶ 66} In this case, the trial court abused its discretion in failing to perform its duty to place values on the health care retirement subsidies and the sick leave accrual. In addition, the trial court abused its discretion in failing to request the parties to submit additional evidence if the court felt it was necessary to make that determination. Furthermore, the trial court abused its discretion in not employing a valuation date that was consistent with the date used for other valuations, but instead using an unknown future date.
 {¶ 67} For the foregoing reasons, appellant's two assignments of error are well-taken. The judgment of the Geauga County Court of Common Pleas is reversed and remanded to the trial court for rehearing in accordance with this opinion.
Grendell, J., Rice, J., concur.
[1] One year of "credited service" is equal to one hundred twenty days of paid time in the classroom.
[2] November 6, 2000, was the date of the Divorce Hearing.
[3] Appellee could have used his accumulated sick days to satisfy the one hundred twenty day requirement for that last year of credited service, but since he had not done so by the end of the marriage, we will not consider that option.
[4] It appears that appellant had this valuation report prepared for the divorce hearing, which was originally scheduled for March 10, 2000.
[5] A recent case by the Alaska Supreme Court addressed this issue in the context of retirement health insurance benefits which it found to be a marital asset of the insured spouse subject to equitable distribution. In Hansen v. Hansen (2005),119 P.3d 1005, at 31, the court recognized the difficulty in calculating the value of this benefit where the insured spouse had not yet retired, but nonetheless ordered the superior court to "exercise its discretion in fashioning an equitable division of this benefit[,]" to receive additional evidence if necessary, and to look at the amount of the premium subsidy provided by the employer in doing so.
[6] Medicare has two parts: Part A, the hospital portion of the coverage, and Part B, which covers medical services, including doctors' services.
[7] This report was prepared pursuant to R.C. 3307.512, which requires the STRS to present a report to the Ohio Retirement Study Council in any year that its funding period, the number of years needed to fully fund accrued liabilities of its pension fund, exceeds thirty years, which includes a plan on how it will reduce this amortization period to thirty years or less.
[8] As of January 1, 2002, R.C. 3307.371 rendered public retirement pension programs subject to a QRDO. However, it only applies prospectively; i.e., to divorces filed after its effective date.
[9] Airline and steel company employees have realized this unfortunate reality in recent years. Companies such as Bethlehem Steel, United Airlines, and US Airways have turned over their under funded, defined benefit pension plans to the federal Pension Benefit Guaranty Corp. ("PBGC"). However, PBGC places caps on the amount of pension it guarantees. For example, a United Airline pilot would have traditionally counted on retiring with an annual pension of $140,000. Under the PBGC, sixty year-old pilots (mandatory retirement age for pilots), can only receive a maximum pension benefit of $29,648 per year. To confound the problem even more, PBGC's deficit is growing as more companies follow suit, jeopardizing the pensions of perhaps four hundred million Americans. U.S. News and World Report, Jan. 24, 2005, "Pension Tension: Workers Can No Longer Count on Company-Funded Retirements"; http://www.usnews.com/usnews/biztech/articles/050124/24pension.htm.